Wright, J.,
delivered the opinion of the Court.
This is an appeal in the nature of a writ of error,. *274 from the Circuit Court of Knox county, for the sum of $11,000, in.a suit brought by William C. Nelson against the East Tennessee &' Georgia Railroad Company, for failing to transport, in due time, a large quantity of wheat, whereby the plaintiff alleges he was greatly damaged.
There was evidence of a contract between P. D. Gates, of the city of New York, and said Nelson, who was a resident of East Tennessee, whereby the former agreed to pay the latter one dollar per bushel for red, and one dollar and ten cents per bushel for white, wheat, of prime quality; and live per cent, commission for buying and shipping, for all that he could get started from the depots of the East Tennessee & Georgia Railroad Company, in time, certainly, to reach New York in July, August, or September, 1857; but enjoining upon him the necessity, if possible, of getting it off in time to reach New York in the months of July and August. The proof did not make it clear whether the wheat, in its transit to New York, was to be at the risk of Nelson or Gates. For all wheat of the quality named, so bought and shipped, Nelson was authorized to draw on Gates, at New York, at sixty days’ time from the date of starting the wheat from the various depots. There was also evidence of a special contract, between Nelson and the East Tennessee & Georgia Railroad Company, that cars would be furnished to take forward the wheat as fast’as Nelson would have it delivered at the depots; and upon the faith of this contract, he bought a large quantity, and became bound to the individuals of whom it was purchased, for the cost of it. The quantity purchased, amounted, in all, to 51,984 bushels, much of which lay *275 in store at the depots of the company from three weeks to two months, and much the greater portion was not received by Gates, in New York, until after the 5th of October, and between that time and the 6th of November, when the price of wheat had greatly fallen, and was sold at a loss. Some of it arrived in a damaged state, probably caused by having been too long stored in large quantities, either at the depots of the company, or in its transit to New York. It appeared that freight usually went from East Tennessee to New York in twelve or fifteen days.
The wheat crop of 1857 was uncommonly large; and it would seem, from an examination of many witnesses on the part of the plaintiffs in error, and especially of their officers and agents along the line of the road,. that the defense, before the jury, was put upon the ground of the extraordinary crop, and the want of cars to transport it; and yet it was admitted by the plaintiffs in error, upon the trial, as evidence, that they had ample means to have carried off all the produce transported on their road during the months of July, August, and September, 1857, promptly, upon its delivery.
The Circuit Judge permitted the verdict to stand, and there is nothing to authorize this Court to grant a new trial merely upon the evidence. If had at all, it must be because of some error of law. Only certain portions of the charge to the jury are set out in the bill of exceptions, and we must presume the residue to have been full and accurate. Nor do we understand that counsel, in argument here, call in question the correctness of all that part of the charge which is set -out. Certainly, no valid objection can be taken to that part *276 of it relating to the duty of the plaintiffs in error to have shipped the wheat of Nelson, either under the special contract to do so, (if the jury should believe there was such a contract,) or, if none, then under the obligation imposed upon the company by law, as common .carriers, If the contract existed, the plaintiffs in error were bound to ship the wheat according to the contract, unless prevented, or excused from so doing, by Nelson; and if it 'did not, it was the duty of the plaintiffs in error, as common carriers, to have sent forward .the wheat within a reasonable time after it was received for transportation. Such is the effect of this part of the charge. The law is, that in the absence of a special contract, the carrier is bound to perform his duty, i. e., deliver the goods at their destination, or at the end of his route, to the next carrier, in a reasonable time, according to the usual course of his business, with all convenient dispatch. And if the carrier, or his servant, within the scope of his employment and duty, enter into any special contract to deliver, in any particular time, or place, even beyond the terminus of his particular route, it will be binding; and the owner, it would seem, may recover damages, with reference to expected profits, had the goods been delivered in time. But, if the carriers, being a railway company, make no special contract to deliver in any particular time, and a delay happen in the transportation, in consequence of an unusual press in business, the company having a reasonable equipment for all ordinary purposes, and the goods being carried with as much expedition as is practicable, under the circumstances, they are not liable for damages; and for any injury to the goods during the delay, the company are liable: Redfield on *277 Railways, 318-819. Applying these principles to the facts of this case, it would be difficult to affirm that the plaintiffs in error had shown any satisfactory excuse for the delay in regard to this wheat.
But it is said Nelson cannot maintain the action, because the wheat did not belong to him, but to G-ates, and that Nelson was merely his agent in purchasing it. Upon this question, the Circuit Judge, (so far as we have the charge,) instructed the jury that if they should believe, from the proof, that Nelson was employed by Gates to purchase the wheat for him, (Gates,) the wheat thus purchased would be the property of Gates; and not Nelson’s, and therefore the action could not be maintained. But, on the other hand, if the jury should believe, from the proof, that Nelson and Gates had entered into a contract, by the terms of which Gates had agreed to give Nelson a specified price for all the wheat that Nelson would deliver Gates, in the city of New York, by a specified time, and this wheat was purchased by Nelson to fill said contract,, it would belong to Nelson until it reached the city of New York. This instruction is not erroneous. As a general rule, the consignee is the proper person to sue the carrier for a breach of duty, or contract, in regard to the property shipped. But this is because he is owner, or has some special 'property in the goods, as would have been the case, if Nelson, as his agent, had bought the wheat here for Gates absolutely, and shipped it to him as a purchaser, at all events. It, then, would have been his property, even from the date of the purchase, and a fortiori after its shipment, and he should sue. But, on the other hand, it is equally well settled, that the consignor, who *278 owns the goods, and sustains the injury from the damage, or loss, is the proper party to bring the action against the carrier: Redfield on Railways, 322; Turney vs. Wilson, 7 Yer., 340-343. As here, if the contract was merely executory between Nelson and Gates, and the latter was only to pay for the wheat which the former should cause to be delivered to him, by a given day, in New York, then, until the delivery, the wheat would be at Nelson’s risk. He would be the owner, and the proper person to sue. The case was put to the jury in these two aspects, and they thus found the right of suit in Nelson: and this Court cannot say their verdict is unwarranted by the proof.
But, as to the wheat bought and started within the terms of this contract, it is not, in this case, very material to inquire as to its ownership during its transit to New York; and if it were, it was a question dependent upon the terms of the contract, which, not being in writing, was for the jury to settle, and as to which we must suppose they were properly instructed. We say it is not material, because the uncommon delay of the plaintiffs in error to carry the wheat delivered to them by Nelson, as well as their neglect to take due care of it while in store, was a breach of their contract, and an omission of duty which instantaneously gave a cause of action, although the amount of damage or loss from the injury might not be ascertainable until the subsequent sale of the- wheat was actually made: Wilcox et als. vs. the Executors of Plummer, 4 Pet., 172. This right to sue and recover damages undoubtedly accrued to Nelson, since the wheat, while in store, and before it was actually started en route for New York, unquestion *279 ably belonged to him; and that which was started out of time, or had ceased to be of the requisite quality, and in regard to which, it seems probable, the chief, if not the only, damage, was sustained, continued to be his until its actual sale in New York.
Again: — It is insisted that Nelson has, in truth, sustained no damage: that though the greater part of the wheat reached New York out of time, yet, that nevertheless, Gates received and sold it, without objection, and became liable, as if it had been duly delivered. So, that Nelson has, in law, the full benefit of his contract. There is no doubt, but that a principal may ratify the act of one who has acted in his behalf, as his agent, though without authority, or who has transcended' his powers; and in this way give validity to the act, as it had been strictly authorized in the first instance. This notification may take place, not only directly, but may be implied from collateral acts. The question, whether the receipt and sale of the wheat at New York, amounted to a ratification of the acts of Nelson in sending it out of time — was not a matter of lato for the Court — but depended on the circumstances attending the transaction, and was a subject properly to be left to the jury: Bell et als. vs. Cunningham, 3 Pet., 69, 81. For the wheat, which so arrived out of time, Gates claims to account to Nelson for its net proceeds as a factor, and not as a purchaser, thus, throwing the loss produced by the wrongful omission of the plaintiffs in error, upon Nelson. Now, in what character Gates accepted and sold this wheat — whether as a purchaser under the contract, or as a factor for Nelson — and whether he had waived any of his right upon the con *280 tract against the latter — were all questions of fact for the jury, upon which, we must suppose, they received full and proper instructions from the Court, as the bill of exceptions contains no intimation to the contrary, and upon which they must have passed and found that — after the 1st of October — Gates was to be held as the factor of Nelson. If so,, we are bound to respect this finding, the same, in our opinion, being sufficiently supported by the facts. So far as Nelson complied with his contracts, and furnished wheat of the quality, and within the time limited, his liability for Gates’ acceptances, as between them, was discharged, and Gates become primarily bound to the holders of the bills to save him harmless. But, as to the acceptances not so met, the rule is precisely the reverse, and Nelson remained bound to place Gates in funds to meet them: the same as is the case of an accommodation acceptance. Such, it seems to us, upon this contract, was the relation between these parties. The wheat that came to Gates’ hands from Nelson — not of the quality required in the contract, or not within the time limited — he was not called upon to reject altogether: neither could it be held, that its mere reception and sale by Gates, in and of itself, without some new engagement, or election by him to that effect, should charge him as a purchaser, under the contract. On the contrary, he might well receive all such wheat on Nelson’s account, and sell the same, as his agent and factor. Indeed, it would still be the duty of Nelson to continue to place Gates in funds, until any excess of acceptances over and above those satisfied under the contract, (which expired ■ the 1st of October,) was met. *281 We do not perceive that this view of the case is changed, by the time at which the bills were drawn and accepted. They are not on file, or in evidence; but their amount is stated to have been about $83,000, and they do not appear to have been drawn or accepted after the 1st of October, and we are satisfied they were not, since Gates proves that he made the acceptances upon the faith of the arrival of the wheat at New York, in time to meet them; and would not have done so, if he had supposed, or known, that it was to be delayed from thirty to sixty days in store, at the depots of the plaintiffs in error. And besides, the bills having matured, 'were (to the amount of $24,000) renewed in the Planters' Bank of Tennessee, at Athens, between the 1st and 5th of October, for the further time of sixty days, showing that they must have been drawn early in August. In truth, it is to be inferred, that they were drawn and accepted anterior to the starting of the wheat from the depots of the plaintiffs in error ; and it is not shown, that when Gates made the acceptances, he had any Jcnowledge that the wheat was so detained. The renewal of the bills did not change the relation previously existing between Gates and Nelson, since they both assumed the same position on the paper as before. Besides, if Gates had paid the bill to the Bank, (the holder,) in our view, it would not, in the least, have effected his claim on Nelson to be reimbursed for any payments he so made, without being put in funds to the latter. How the balance stands between Nelson and Gates, does not appear in this record, as they have had no settlement. Nor, is this *282 material. Gates failed in December, 1857, and is now insolvent.
Nothing is left to us, but to consider the remaining portion of the charge. It was insisted before the jury, that no recovery by Nelson could be had, even if the wheat was unreasonably delayed, because the. Western & Atlantic Kail Koad Company — had it been forwarded with all dispatch — would not have received it from the plaintiffs in error, at Dalton, or transported it from thence; and because it was alleged that the plaintiffs in error were willing, and offered to ship the wheat to Dalton,, provided Nelson would take charge of it at that place, which, it was insisted, he declined to do. Upon this subject, the Circuit Judge instructed the jury, that it would not exonerate the plaintiffs in error for them to show that the Western & Atlantic Rail Road Company would not have shipped the wheat, provided it had been delivered, or tendered said road at Dalton. It was the duty -of the plaintiffs in error to have discharged their duty, and if other connecting roads did not do their duty, Nelson could enforce his legal remedy against said roads; but, if the plaintiffs in error offered to ship the wheat to Dalton, and Nelson, for any reason, declined to have it done, he could not recover in this action.
This charge, we think, was clearly correct, and the verdict of the jury must be held to have settled that Nelson had done nothing to excuse the plaintiffs in error from the prompt transportation of this wheat. That the Western & Atlantic Railroad Company might not do their duty, and might fail to have the necessary cars and hands to receive and put forward the wheat at *283 Dalton, could, in no way, excuse the plaintiffs in error from a strict performance of their duty. That the Western & Atlantic Railroad Company, if the wheat had been tendered to them at Dalton, would have been bound to have accepted it from the plaintiffs in error, and to have forwarded it with proper dispatch, does not admit of debate; and for any wrongful omission to do so, they certainly would have been liable to Nelson in damages for the consequences; and if the plaintiffs in error had done their duty, they would have been absolved. But they did not. It is a well settled principle of the law, applicable to common carriers, both of goods and passengers, that they are bound to carry , for all persons who apply, unless they have a reasonable excuse for the refusal to do so. Carriers of goods and passengers, who set themselves before the public as ready to carry for all who apply, become a kind of public officers, and owe to the public a general duty, independent of any contract in the particular case: Redfield on Railways, 261.
It is insisted that tbe delay which would have taken place at Dalton, if .it did not furnish an answer to the action, must reduce the amount of the recovery. If this were so, we must, upon this record, presume that the Circuit Judge properly instructed the jury upon this subject, and that they duly considered it in making up their verdict, since there is nothing to the contrary in the bill of exceptions, and no request, or refusal, whatever, to charge in relation to this aspect of the case. But we do hot see how this could have mitigated the damages. Nelson, (if there was unnecessary delay, or neglect,) was entitled to full damages somewhere, either from the plaintiffs in error, or the Western & Atlantic Railroad Com *284 pany. But liow could he get it from this latter company, unless the wheat were tendered to them to carry? We may remark, too, that the weight of the proof is, that if the wheat had gone forward upon the road of the plaintiffs in error, it would not have been unreasonably delayed at Dalton.
Upon the entire case, wc discover no reason for a reversal of this judgment.